15-131(L)
*United States v. Tang Yuk et al.*

# United States Court of Appeals
## FOR THE SECOND CIRCUIT

August Term, 2016

(Argued: September 27, 2016    Decided: March 15, 2018)

Docket Nos. 15-131 (L), 15-141 (CON), 15-230 (CON)

UNITED STATES OF AMERICA,

*Appellee,*

–v.–

KIRK TANG YUK, AKA SEALED DEFENDANT 3, GARY THOMAS, AKA SEALED DEFENDANT 2, AND FELIX PARRILLA, AKA SEALED DEFENDANT 1, AKA LITO,

*Defendants-Appellants.*

B e f o r e :

CHIN and CARNEY, *Circuit Judges*, and FORREST, *District Judge.*[*]

Three defendants found by a jury to have engaged in a criminal conspiracy to distribute and possess with intent to distribute cocaine challenge their convictions, contending that venue did not properly lie in the Southern District of New York, the place of their prosecutions. The government does not dispute that the bulk of defendants' joint criminal activity took place in the U.S. Virgin Islands and in Florida.

---

[*] Judge Katherine B. Forrest, of the United States District Court for the Southern District of New York, sitting by designation.

We consider whether, nonetheless, the defendants' activities and knowledge of the related travel to New York by one of their number, who had left Florida with drugs obtained through the conspiracy and traveled to the New York area with plans to sell the drugs there, suffice to support venue in the Southern District as to each defendant. We conclude the actions of the conspirators in the district, and the defendants' knowledge of that activity, render venue in the Southern District of New York proper. Accordingly, we AFFIRM the judgments of conviction entered by the District Court.

Judge Chin dissents in a separate opinion.

AFFIRMED.

––––––––––––

CHRISTOPHER P. CONNIFF, Ropes & Gray LLP, New York, New York, *for Kirk Tang Yuk*.

STEPHEN N. PREZIOSI, Law Office of Stephen N. Preziosi P.C., New York, New York, *for Felix Parrilla*.

KYE WALKER, The Walker Legal Group, Christiansted, St. Croix, U.S. Virgin Islands, *for Gary Thomas*.

EDWARD A. IMPERATORE, Assistant United States Attorney (Emil J. Bove III, Adam S. Hickey, Assistant United States Attorneys, Of Counsel, *on the brief*), *for* Preet Bharara, United States Attorney for the Southern District of New York, New York, New York, *for the United States of America*.

––––––––––––

SUSAN L. CARNEY, *Circuit Judge*:

Three defendants found by a jury to have engaged in a criminal conspiracy to distribute and possess with intent to distribute cocaine challenge their convictions, contending that venue did not properly lie in the Southern District of New York, the place of their prosecutions. We consider whether, although the bulk of their joint

2

criminal activity took place in the U.S. Virgin Islands and in Florida, the defendants' activities and knowledge of the related travel to New York by one of their number, who had left Florida with drugs obtained through the conspiracy and traveled to the New York area with plans to sell the drugs there, suffice to support venue in the Southern District as to each defendant. We find the actions of the conspirators in the district, and the defendants' knowledge of that activity, render venue in the Southern District of New York proper. We also reject the defendants' other challenges to their convictions and sentences, which include, *inter alia*, challenges to the District Court's denial of three suppression motions, a contention that the government failed adequately to disclose impeachment evidence regarding its lead witness, and arguments that the District Court improperly calculated the defendants' Guidelines ranges.

Accordingly, we AFFIRM the judgments of conviction entered by the District Court.

## BACKGROUND

Defendants-appellants Kirk Tang Yuk, Felix Parrilla, and Gary Thomas appeal their convictions under 21 U.S.C. §§ 841(b)(1)(A) and 846 for conspiracy to distribute and possess with intent to distribute five or more kilograms of cocaine. As we must when evaluating an appeal following a conviction by a jury, we recite the facts in the light most favorable to the government, and as the jury was entitled to find them in its deliberations. *United States v. Lange*, 834 F.3d 58, 64, 69 (2d Cir. 2016).

### A.    The conspiracy

In the summer of 2012, Gary Thomas, a resident of St. Croix, asked an acquaintance, Deryck Jackson, a resident of Florida, and not an appellant here, if he wanted to earn money by helping Thomas bring cocaine from St. Croix to Florida. Jackson was willing, and he flew from Miami to St. Croix to meet with Thomas. As

3

Jackson later testified, Thomas told Jackson that he was "getting the drug deal together" and that Jackson should "make [him]self available." TY App'x at 250.[1] Thomas told Jackson not to mention the cocaine deal to their mutual friend in Florida, Kirk Tang Yuk, explaining his concern that Tang Yuk had a "big mouth." TY App'x at 250-51. Thomas then introduced Jackson to Felix Parrilla, a Florida resident, and told Jackson that Parrilla would be Jackson's contact person in Florida for the planned transaction.

Later, back in Florida, and despite Thomas's request, Jackson told Tang Yuk that he expected to be involved in a drug transaction. Tang Yuk expressed interest in participating in the transaction.

September 2012 arrived and Thomas called Jackson, advising that he was ready to go forward with the plan. Jackson returned to St. Croix and there, on the site of Paradise Waste Management, Thomas's business, he helped Thomas prepare and package cocaine for shipment. To conceal the drugs during shipment, the two men installed false wooden flooring in a packing crate and sprinkled a chemical in the bottom of the crate to help mask the cocaine's smell. They packed 80 kilograms of cocaine in the crate. Jackson then returned to Florida.

On September 18, Thomas called Jackson again and advised that the cocaine was ready for pickup in Miami. Jackson rented a U-Haul truck and retrieved the crate containing the concealed drugs. He moved the crate to a storage facility, where he repackaged the drugs into four cardboard boxes, placing dryer sheets and rice in the boxes to help mask the cocaine's odor. He then brought the boxes to his apartment.

On the following day—September 19—Jackson visited Parrilla at his place of business, a garage. There, Parrilla informed Jackson that he (Parrilla) would take 53

---

[1] We refer to the appendix filed by defendant Kirk Tang Yuk as the "TY App'x," the appendix filed by defendant Gary Thomas as the "Thomas App'x," the appendix filed by defendant Felix Parrilla as the "Parrilla App'x," and the Supplemental Appendix as "Supp. App'x."

4

kilograms of the cocaine and Jackson would keep the remaining 27 kilograms "on consignment." TY App'x at 323-25. Later that afternoon, Jackson on his own initiative spoke with Tang Yuk. The two had a rendezvous at Jackson's apartment, where Jackson gave Tang Yuk two kilograms of Jackson's portion of 27 kilograms, also "on consignment." TY App'x at 337. Tang Yuk promised to pay Jackson $27,000 for each of his allotted two kilograms.

On September 20, Jackson delivered 53 kilograms of the cocaine to Parrilla. Jackson then promptly left Miami to drive with his wife to New York City, where he planned to sell some of his 25 remaining kilograms of cocaine to an associate, Fred Fulton. Jackson and his wife arrived in Queens on September 22, after crossing over the Verrazano-Narrows Bridge from Staten Island over the Narrows into Brooklyn, and then driving on into Queens. That evening, Jackson was arrested at the hotel where he had checked in and delivered the drugs to Fulton.

During the same time period, on September 20, the Drug Enforcement Agency (DEA) executed a "sneak and peek" search warrant on Parrilla's business in Florida. A DEA agent described this type of warrant at trial as a "covert" warrant authorizing a "limited" search of the location without notification to the premises owner. In Parrilla's garage, the agents found brown U-Haul boxes, white rice, dryer sheets, and shrink wrap.

While the agents were conducting the search, they noticed Parrilla driving down the street toward his garage, and then suddenly changing direction and speeding away. About 45 minutes later, Parrilla returned and spoke with some of the agents, who were still at the location. In response to the agents' question whether "he had any cash on him," Parrilla admitted that he did, and pulled out "a wad of cash" from his pants

pocket. Combined with cash located in a search of his vehicle, the agents recovered, and returned to Parrilla, approximately $17,000.

After his September 22 arrest in New York City, Jackson agreed to cooperate with the government. In late September and early October, at the government's instance, he made recorded calls to Tang Yuk and Thomas from a court building in Manhattan, in the Southern District. In a call made on October 1, Jackson told Thomas that he was "on the road." Supp. App'x at 174. He also admitted to Thomas that he "gave [Tang Yuk] a little work," but denied that Tang Yuk "kn[e]w anything, where it came from or nothing." *Id.* at 175.

On October 4, in a telephone conversation recorded by the government, Jackson told Tang Yuk, "Well I am trying to wrap up this thing. I am up here in New York. I am trying to wrap up and come back down." Tang Yuk responded, "Do your thing, man. It ain't nothing." *Id.* at 186. Jackson and Thomas also spoke that day in a recorded phone conversation, which opened with Thomas demanding of Jackson, "You are in here or what?" and Jackson responding, in part, "Well I am just letting know you [sic] that everything is alright." Jackson told Thomas, "I ain't telling you where I was, but I'm telling you now. I'm up in New York. That's why I'm taking this kind of longer way up. Alright." *Id.* at 189. The recording then ended.

On October 12, with Jackson still not back in Florida, Thomas sent Jackson a text message, warning, "You need to deal with [Parrilla] now, it's about to get ugly. Give him what you have." TY App'x at 399. Four days later, Jackson called Thomas. He asked, "What kind of messages are you sending me? Listen I finished, I'm on my way back down. . . . This call, call business and all kind of things you're leaving, you know we don't operate like that man." Supp. App'x at 198. Thomas explained that a mutual friend of theirs had informed Thomas that Jackson had been "picked up." *Id.* That

6

possible development, he said, "just sent me in a [expletive], what you name there, ok . . . in a panic." *Id.* at 199. Jackson replied, "Yeah then you sent me a text saying that uhm . . . the man [Parrilla] said it's about to get ugly or something." *Id.* Thomas confirmed that Parrilla had told him something similar. Closing the conversation, Jackson promised, "Well listen. Today is what? Tuesday. I'm going to be there by Thursday. Alright I will call you and let you know." Supp. App'x at 199.

Parrilla, Thomas, and Tang Yuk were arrested on June 5, 2013.

**B.    Procedural history**

Before trial, Thomas moved to transfer his case to the St. Croix division of the U.S. District Court for the District of the Virgin Islands. The District Court denied this motion, concluding that the only factor strongly favoring transfer was that Thomas's place of residence was in St. Croix, and, accordingly, transfer was not warranted. *United States v. Parrilla*, No. 13 Cr. 360(AJN), 2014 WL 1621487, at *13-15 (S.D.N.Y. Apr. 22, 2014). At trial, Thomas unsuccessfully renewed his request to transfer venue, arguing that the government's use of a patois expert from Jamaica, not St. Croix, to translate certain recorded telephone conversations was prejudicial to him. The District Court explained that the government witness was qualified as an expert in patois speech generally, not merely in the St. Croix dialect, and that, to the extent the recordings included statements in English, the jury would be instructed to consider the audio tapes themselves, not the expert's testimony or transcripts of the tapes. In denying transfer, the District Court also noted that Thomas had invoked his objection to the patois expert in support of his transfer request only "after a jury was impaneled, long after all parties were put on notice of the government's intention to put forward an expert relating to the transcripts, [and] long after the Court and parties had already expended significant time and energy to try this case in this district." Thomas App'x at 562.

7

At the close of the eight-day trial, the District Court charged the jury as follows with regard to venue:

> In addition to all of the elements I have described, you must consider the issue of venue; namely, whether any act in furtherance of the crime charged in Count One occurred within the Southern District of New York. The Southern District of New York includes Manhattan and the Bronx, Rockland, Putnam, Dutchess, Orange, and Sullivan Counties and bridges over bodies of water within the boundaries of Manhattan, the Bronx, and Brooklyn, such as the Verrazano-Narrows Bridge.
>
> In this regard, the government need not prove that the entirety of the charged crime was committed in the Southern District of New York or that any of the defendants were present here. It is sufficient to satisfy the venue requirement if any act in furtherance of the crime charged occurred within the Southern District of New York, and it was reasonably foreseeable to the defendant that you are considering that the act would take place in the Southern District of New York.
>
> I also instruct you that a call or text message made between a government cooperator in the Southern District of New York and a defendant who is not in the Southern District of New York can establish venue with respect to that defendant, provided that the defendant used the call or text message to further the objectives of the charged conspiracy, and the defendant knew or could have known that the call or text came from or went to the Southern District of New York.

Parrilla App'x at 805-06.

The jury convicted each of Parrilla, Thomas, and Tang Yuk, respectively, of one count of conspiracy to distribute and possess with intent to distribute five kilograms or more of cocaine. All three defendants moved for judgments of acquittal pursuant to Federal Rule of Criminal Procedure 29 and for a new trial pursuant to Rule 33. In their post-trial motions, Thomas and Tang Yuk challenged the sufficiency of the government's venue evidence in addition to other aspects of the trial. On December 23,

8

2014, the district court denied Defendants' motions in a written opinion. *United States v. Parrilla*, No. 13-CR-360 (AJN), 2014 WL 7496319 (S.D.N.Y. Dec. 23, 2014). It later sentenced them to the following terms of imprisonment: Parrilla, 300 months; Thomas, 216 months; and Tang Yuk, 151 months.

All three defendants timely appealed. On appeal, they each argue that venue did not properly lie in the Southern District of New York. In addition, *Thomas* argues that the District Court erred in denying his motion to transfer the case to St. Croix for trial and that he is entitled to a new trial because Jackson perjured himself and the District Court violated his Sixth Amendment rights by limiting his cross-examination of Jackson. *Parrilla* contends that the District Court erred in denying his motion to suppress evidence obtained as a result of three allegedly unconstitutional searches and in admitting evidence about Parrilla's attempts to intimidate Jackson in prison. *Tang Yuk* argues that the record evidence was insufficient to convict him of the charged conspiracy—at most, he claims, he participated in a side conspiracy with Jackson to distribute and possess with intent to distribute two kilograms of cocaine. Tang Yuk submits further that the government violated his rights under *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972), by producing possible impeachment evidence in a difficult-to-review format, and that his conviction was tainted by the government's improper comments during summation.

Finally, all three defendants challenge the District Court's calculation of their Sentencing Guidelines ranges as follows: (1) as to *Parrilla* and *Thomas*, that the District Court erred in finding that the conspiracy of which they were convicted involved 80 kilograms of cocaine; (2) as to *Parrilla*, that the District Court erred in applying various enhancements to his offense level; and (3) as to *Tang Yuk*, that the District Court erred in

9

failing to apply an offense level reduction for his "minor" or "minimal" role in the offense.

## DISCUSSION

**A.     Venue**

**1.     Applicable law**

Embodying a constitutional principle, *see* U.S. Const. amend. VI; *id.* at art. III, § 2, cl. 3, the Federal Rules of Criminal Procedure require the government to "prosecute an offense in a district where the offense was committed," and the court to "set the place of trial within the district with due regard for the convenience of the defendant[s], any victim, and the witnesses, and the prompt administration of justice," Fed. R. Crim. P. 18; *see also United States v. Lange*, 834 F.3d 58, 68 (2d Cir. 2016). If the federal statute defining a particular offense does not specify how to determine "where the offense was committed," Fed. R. Crim. P. 18., "[t]he *locus delicti* must be determined from the nature of the crime alleged and the location of the act or acts constituting it." *United States v. Tzolov*, 642 F.3d 314, 318 (2d Cir. 2011) (quoting *United States v. Cabrales*, 524 U.S. 1, 6-7 (1998)). "Venue is proper only where the acts constituting the offense—the crime's 'essential conduct elements'—took place." *Id.* (quoting *United States v. Rodriguez-Moreno*, 526 U.S. 275, 280 (1999)).

Constitutional and procedural restrictions on criminal venue, accordingly, do not protect defendants from prosecution in a district far from their homes if they commit a crime in a remote district. As far-reaching communications and travel are now easy and common, the "acts constituting the offense" can, unsurprisingly, span a geographic range that extends far beyond the physical borders of a defendant's district of residence. Venue, moreover, "may lie in more than one place if the acts constituting the crime and the nature of the crime charged implicate more than one location," *Lange*, 834 F.3d at 68

10

(internal quotation marks omitted), or if the crime begins in one location and ends in another, *see* 18 U.S.C. § 3237(a); *see also United States v. Holcombe*, No. 16-1429-cr, 2018 WL 1021315, at *2 (2d Cir. Feb. 23, 2018). This observation is particularly apt where, as here, the charged crime is a conspiracy, because "any district in which an overt act in furtherance of the conspiracy was committed" is properly designated as the "district where the offense was committed," so long the act was performed (1) "by any conspirator," and (2) was undertaken "for the purpose of accomplishing the objectives of the conspiracy." *Tzolov*, 642 F.3d at 319-20 (internal quotation marks omitted); *see United States v. Smith*, 198 F.3d 377, 382 (2d Cir. 1999) (finding venue in the Southern District of New York proper when the defendant's co-conspirator performed an overt act in Manhattan in furtherance of their conspiracy).

### a. Foreseeability

In our Circuit, the venue analysis does not end as to all defendants charged with a conspiracy when we find a single overt act performed in the district of prosecution, however. We have interpreted the venue requirement to demand "some sense of venue having been freely chosen by the defendant." *United States v. Davis*, 689 F.3d 179, 186 (2d Cir. 2012) (internal quotation marks and alterations omitted). We have said that it must have been "reasonably foreseeable" to each defendant charged with the conspiracy that a qualifying overt act would occur in the district where the prosecution is brought. *United States v. Rommy*, 506 F.3d 108, 123 (2d Cir. 2007); *see also United States v. Svoboda*, 347 F.3d 471, 483 (2d Cir. 2003) (holding that "venue is proper in a district where (1) the defendant intentionally or knowingly causes an act in furtherance of the charged offense to occur in the district of venue or (2) it is foreseeable that such an act

11

would occur in the district of venue").[2] Actual knowledge that an overt act was committed in the district of prosecution is not required, however: venue will lie if a reasonable jury could find that it was "more probable than not" that the defendant "reasonably could have foreseen" that part of the offense would take place in the district of prosecution. *Davis*, 689 F.3d at 189.

### b. Substantial contacts

We have "occasion[ally] . . . supplemented our venue inquiry with a 'substantial contacts' test that takes into account a number of factors . . . . includ[ing] the site of the defendant's acts, the elements and nature of the crime, the locus of the effect of the criminal conduct, and the suitability of the [venue] for accurate factfinding." *Lange*, 834 F.3d at 71 (internal quotation marks omitted). We have acknowledged that this is not a "formal constitutional test," *United States v. Saavedra*, 223 F.3d 85, 93 (2d Cir. 2000), but have nevertheless found it to be a valuable safeguard for a defendant whose contacts with the district of prosecution are minimal.

When an overt act in furtherance of a criminal conspiracy has been committed in the district, however, this supplemental inquiry has no relevance. A defendant who is participating in a conspiracy that is being conducted, in part, in the district of prosecution necessarily has sufficient "substantial contacts" to justify a finding of venue that is otherwise proper. *See, e.g.*, *Lange*, 834 F.3d at 75 (finding that defendants had substantial contacts with E.D.N.Y. based in part on the fact that "some of [their] co-conspirators' acts occurred in the [E.D.N.Y.]"); *see also Tzolov*, 642 F.3d at 321 (finding

---

[2] Other Circuits have not adopted such a requirement. *See, e.g.*, *United States v. Castanada*, 315 F. App'x 564, 569-70 (6th Cir. 2009) (collecting cases); *United States v. Johnson*, 510 F.3d 521, 527 (4th Cir. 2007). It is also true that our seminal case in this regard, *United States v. Svoboda*, 347 F.3d 471, 483 (2d Cir. 2003), identified a foreseeability requirement without extensive analysis. Nonetheless, we are bound to examine this factor in assessing whether the venue of these prosecutions was proper as to each defendant.

defendant's contacts sufficiently "substantial" where defendant "committed overt acts in furtherance of the conspiracies" in the district of prosecution); *United States v. Naranjo*, 14 F.3d 145, 147 (2d Cir. 1994) ("Though [*United States v.*] *Reed*[, 773 F.2d 477 (2d Cir. 1985)] refers to a 'substantial contacts rule' for determining venue, it is clear that the panel regarded the locale of the defendant's acts as a sufficient basis for establishing venue . . . ." (internal citations omitted)); *cf. Saavedra*, 223 F.3d at 93 ("The substantial contacts rule offers guidance on how to determine whether the location of venue is constitutional, especially in those cases where the defendant's acts did not take place within the district selected as the venue for trial."); *Reed*, 773 F.2d at 481 (noting that venue can be proper even when a defendant has "only limited contact" with the district of prosecution if the "acts constituting the crime" occurred in that district and citing "[a] foreign courier attempting to import illegal drugs through Kennedy Airport" and "a co-conspirator in Miami who never set foot in New York" as examples).

### 2. Jury instruction regarding venue

Thomas and Tang Yuk (but not Parrilla) contend that the District Court erred by instructing the jury that "a call or text message made between a government cooperator in the Southern District of New York and a co-conspirator defendant who is not in the Southern District of New York," Parrilla App'x at 805-06, could be sufficient to establish venue in certain circumstances. We review the District Court's instruction *de novo*, finding error if the instruction "misleads the jury as to the correct legal standard or does not adequately inform the jury on the law." *United States v. Roy*, 783 F.3d 418, 420 (2d Cir. 2015) (per curiam) (quoting *United States v. Naiman*, 211 F.3d 40, 50 (2d Cir. 2000)). Even if an instruction was erroneous under this standard, we will not reverse a conviction unless (1) the instruction was prejudicial to the defendant, and (2) the

13

defendant requested an alternative charge that "accurately represented the law in every respect." *Id.*

The jury here was properly instructed as to the effect of the phone calls described above on venue. Our prior decisions leave no room for doubt that, in the context of a conspiracy, "phone calls from one district to another by themselves can establish venue in either district as long as the calls further the conspiracy." *Smith*, 198 F.3d at 382; *see also, e.g., United States v. Friedman*, 998 F.2d 53, 57 (2d Cir. 1993). A telephone call placed by someone within the Southern District of New York—even a person acting at the government's direction—to a co-conspirator outside the Southern District can render venue proper as to the out-of-district co-conspirator so long as that co-conspirator "uses the call to further the conspiracy." *Rommy*, 506 F.3d at 122.

Although both Tang Yuk and Thomas argue that their convictions require an extension of our established venue principles, they fail to identify any statement in the District Court's instruction here that precedent—in particular, our decision in *Rommy*— does not directly support. In *Rommy*, we rejected a venue challenge when a confidential informant located in the Southern District of New York called and spoke to the defendant, who was located overseas, on several occasions. *Id.* at 112-14. During their first call, the informant told the defendant that he was "near the site of the recently destroyed World Trade Center." *Id.* at 113. During that and subsequent calls, the defendant nevertheless confirmed to the caller and putative co-conspirator details relating to a shared plan to smuggle ecstasy pills into New York ports. *Id.* at 113-14. On appeal, we rejected the defendant's argument that a call placed *from* the Southern District of New York at the direction of a law enforcement agent was insufficient to create venue in the district of the caller, explaining that "[w]hat is determinative of

14

venue . . . is whether the conspirator used the telephone call to further the objectives of the conspiracy." *Id.* at 119, 122.

The jury here, therefore, was appropriately instructed by the District Court that venue was proper with respect to a defendant if that defendant used "a call or text message [with] . . . a government cooperator in the Southern District of New York . . . to further the objectives of the charged conspiracy . . . ." Parrilla App'x at 805. The District Court also correctly instructed the jury that, in addition to this "act" requirement, venue was proper only if the defendant "knew or could have known" that the call or text came from the Southern District of New York. *Id.* To the extent that Tang Yuk and Thomas argue that Jackson's calls do not meet the venue standard described in *Rommy*, their quarrel is with the sufficiency of the evidence establishing venue, not the content of the instruction given.

### 3. Sufficiency of evidence

Because venue is not an element of a crime, the government must prove its propriety by only a preponderance of the evidence. *Davis*, 689 F.3d at 185. We review *de novo* the District Court's determination that the evidence was sufficient to support a finding that venue was proper. *Lange*, 834 F.3d at 69. Because Defendants were convicted after a jury trial, we review the record evidence in the light most favorable to the government, drawing every reasonable inference in support of the jury's verdict. *Id.*

#### a. Jackson's overt act

As an initial matter, we note that the evidence at trial was undoubtedly sufficient for the jury to find that Deryck Jackson, who later cooperated with the government, committed an overt act in furtherance of the cocaine importation conspiracy with Thomas, Parrilla, and Tang Yuk in the Southern District of New York: on his way from Florida to Queens to meet Fulton and sell his portion of the cocaine, he drove over the

15

Verrazano-Narrows Bridge from Staten Island to Brooklyn, passing over the channel known as "the Narrows" and through the jurisdiction of the Southern District of New York. *United States v. Ramirez-Amaya*, 812 F.2d 813, 816 (2d Cir. 1987) (finding venue in the Southern District of New York proper for offense of importing cocaine, based on flight of airplane containing cocaine over "the Narrows" before landing in Eastern District, because the Narrows "lies within the joint jurisdiction of the Southern and Eastern Districts of New York"). Because transportation of cocaine to its final point of sale constitutes an "overt act" in furtherance of the conspiracy to distribute cocaine, the Southern District of New York is indisputably "a district where the [conspiracy] offense was committed," as required by Federal Rule of Criminal Procedure 18, for all defendants.

That Jackson took an overt act in furtherance of the conspiracy in the Southern District of New York does not conclusively establish that venue was proper as to Thomas, Tang Yuk, or Parrilla, however. Although we have found that a co-conspirator's commission of an overt act in the district of prosecution fulfills our "substantial contacts" test as to all members of the conspiracy, *see supra*, Discussion Part A.1.b, it does not, without more, establish that prosecution in that district was "reasonably foreseeable" to all members of the conspiracy.

We are skeptical that, as the government asserts, Jackson's drive on the Verrazano-Narrows Bridge was "reasonably foreseeable" to Thomas, Tang Yuk, or Parrilla because of Jackson's family ties in Pennsylvania and New Jersey. The record does not establish that each defendant was likely aware of those family ties. Instead, in view of Jackson's post-arrest conversations with Thomas and Tang Yuk, we find that the jury was entitled to conclude that it was reasonably foreseeable to Thomas, Tang

16

Yuk, and Parrilla that an overt act in furtherance of the conspiracy would be taken in the Southern District of New York.[3]

### b. Thomas

Jackson warned Thomas that he was "on the road" on October 1, 2012, and explicitly told Thomas that he was "up in New York" on October 4.[4] Supp. App'x at

---

[3] The dissent's assertion that Defendants' phone calls with Jackson cannot create venue because Jackson acted at the government's direction is at odds with our decision in *Rommy*. There, we found venue proper based on phone conversations between government actors located in the district of prosecution and a defendant located elsewhere. *United States v. Rommy*, 506 F.3d 108, 122 (2d Cir. 2007) (rejecting the argument that venue analysis is affected by whether "the listener [during a telephone call establishing venue] is a confederate, an innocent third party, or an undercover agent"). Contrary to the dissent's assertion that, unlike the defendant in *Rommy*, Jackson "had no intention of going into the [S.D.N.Y.]" before he began working with government agents, Jackson voluntarily entered the S.D.N.Y. when he transported cocaine over the Verrazano-Narrows Bridge on his way to Queens. The dissent's characterization of the status of the Narrows as part of the S.D.N.Y. as a "legal fiction" has some force, but any line between two districts is a "legal fiction" in some respects. We nevertheless ascribe significant weight to such lines, particularly in the context of criminal venue. *See United States v. Ramirez-Amaya*, 812 F.2d 813, 816 (2d Cir. 1987). And, to the extent the dissent is concerned with government overreaching in requiring Jackson to make these calls to Thomas and Tang Yuk, we acknowledge the concern and the closeness of this case. At the same time, we note that the drug conspiracy at its conception was not so local. At minimum, the conspiracy required activity spanning more than 1,000 miles between the jurisdictions of the Southern District of Florida and the District of the Virgin Islands. And it was Jackson, a full member of the conspiracy, who, independent of government action, brought 25 kilograms of heroin to the New York metropolitan area. Accordingly, the S.D.N.Y.'s connection to the unlawful activity predates the government's active involvement in New York. We thus need not address the dissent's hypothetical regarding whether, if the government had taken Jackson to South Dakota after his arrest in Queens, South Dakota would have become a proper venue for prosecution of the cocaine distribution conspiracy.

[4] Drawing all reasonable inferences in favor of the government, as we must on this post-conviction review, we decline to overturn the jury's finding that venue was, more likely than not, reasonably foreseeable to the Defendants notwithstanding that Jackson did not identify the *Southern District* of New York as his location during his conversations with his co-conspirators. Jackson told Thomas and Tang Yuk that he was in "New York." We think it fair for the jury to have found that the phrase "New York," especially when used speaking to someone out-of-

17

174, 189. Although Jackson had crossed the Verrazano-Narrows Bridge and was in police custody by that point, he implied to Thomas that he was selling the remaining cocaine, as had been Jackson's plan when he came north. The jury could have reasonably inferred that Thomas understood Jackson to be referring to his cocaine sales when, for example, he told Thomas on October 16 that he had "finished." Supp. App'x at 198-99. After all, the two quickly went on to discuss Parrilla's annoyance with Jackson's disappearance, and they did not discuss subjects other than the conspiracy during that call. Moreover, it would be reasonable to expect Thomas to be fixated on Jackson's conspiracy-related activities, because Jackson had received a significant (and

---

state, commonly refers to "New York City," the metropolis that includes portions of both the Southern and Eastern Districts of New York. Close questions regarding the propriety of venue in a given district are bound to arise when a single city spans multiple districts. *Cf. Lange*, 834 F.3d at 67 n.5 (noting, in the context of evaluating whether prosecution in the E.D.N.Y. was foreseeable to a securities fraud defendant, that the area code 718 includes portions "within and outside" the E.D.N.Y.). Here, we do not think it was impermissibly speculative for the jury to infer that Thomas and Tang Yuk would interpret "New York" to include the Southern District of New York. *Cf. United States v. Gleason*, 616 F.2d 2, 13-15 (2d Cir. 1979) (a jury must "use logic and reason in drawing inferences from circumstantial evidence" without speculating); *Smith v. Nat'l R.R. Passenger Corp.*, 856 F.2d 467, 469-70 (2d Cir. 1988) ("Where two equally permissible inferences may be drawn from a single set of facts, we cannot conclude that no fair-minded juror could reasonably infer" one of them.). Although the jury was free to find that Jackson's reference to "New York" was not specific enough to clue his co-conspirators in that their conspiracy might be spreading to Manhattan or the Bronx, their contrary finding was not unreasonable as a matter of law. A single trip to New York City could reasonably involve travel to the Southern and Eastern Districts, or—as Jackson's trip on the Verrazano-Narrows Bridge illustrates—to both districts simultaneously. Certainly, nothing in the record suggests that any defendant had reason to believe that Jackson intended to steer clear of Manhattan, the Bronx, or the counties of Westchester, Rockland, Putnam, Orange, Dutchess, or Sullivan in the course of his drug trafficking activities, and that their conspiratorial activities would therefore occur only in other New York districts. Accordingly, on the facts before us, we defer to the jury's undoubted ability to impose commonsense restrictions on the "foreseeability" of a particular district in the face of an ambiguous locational reference, acknowledging at the same time that some such references (such as "the United States") may be so generic that no jury could infer that they would reasonably alert a defendant to the possibility of prosecution in any particular district.

18

valuable) portion of the cocaine on consignment—27 kilograms out of 80, for which he owed $702,000—immediately before he left Florida. Because "venue may be proved by circumstantial evidence," *United States v. Potamitis*, 739 F.2d 784, 791 (2d Cir. 1984), the jury was entitled to draw such inferences.

Shortly after Thomas learned that Jackson was in "New York," the two discussed several issues related to their drug trafficking conspiracy, including the price that Tang Yuk had been offered for the cocaine, and Parrilla's aggravation about Jackson's disappearance. Thomas asked Jackson when he would be returning to Florida, and Jackson promised to alert Thomas when he was on his way south, presumably with the significant proceeds of his sales. Several days later, Thomas sent Jackson a text message warning, "You need to deal with [Parrilla] now, it's about to get ugly. Give him what you have." TY App'x at 399. Jackson understood that Thomas was concerned that he, Jackson, might have absconded with the cocaine, and was therefore demanding that he bring "whatever cocaine [he] had already s[o]l[d] and money [he] obtained from it" back to Thomas and Parrilla. *Id.* Because Jackson had not yet told Thomas that he was on his way to Florida, the jury could have found that Thomas believed—or, at least, could reasonably foresee—that Jackson was still in New York. Several days thereafter, Thomas spoke to Jackson on the telephone and again directed him to return to Florida to hand over the proceeds of his cocaine sales to Parrilla.

These communications gave the jury a sufficient basis to find that Thomas communicated with Jackson to "further the objectives of the conspiracy," *Rommy*, 506 F.3d at 122, after learning that Jackson was in New York. By advising Jackson to "deal" with Parrilla, Thomas was attempting to prevent infighting and potential violence between the co-conspirators, which might interfere with the conspiratorial goals. And Thomas's encouragement to Jackson to bring his sale proceeds back to Florida inured to

19

the benefit of the conspirators, since Jackson had received the cocaine entirely on consignment and was to return $702,000 to Parrilla. Because Thomas used his calls with Jackson—whom he knew to be in New York—to further the conspiracy, venue was proper as to Thomas in the Southern District of New York.[5]

### c. Tang Yuk

Like Thomas, Tang Yuk was personally informed by Jackson that Jackson was in "New York." Supp. App'x at 186. Jackson told Tang Yuk that he was trying to "wrap up" in New York, and Tang Yuk advised him to "[d]o [his] thing." *Id.* While this evidentiary basis is not overwhelmingly strong, we think nonetheless that the jury was permitted to infer from it that Tang Yuk understood Jackson's reference to "wrap[ping] up" to mean completing, in New York, the sale of his allotment of the conspiracy's

---

[5] Thomas also argues that the District Court erred in denying his motion under Federal Rule of Civil Procedure 21 to transfer venue to St. Croix. "Disposition of a Rule 21(b) motion is vested in the sound discretion of the district court," and we review the denial of such a motion only for abuse of that discretion. *United States v. Maldonado-Rivera*, 922 F.2d 934, 966 (2d Cir. 1990). It is particularly appropriate to defer to the district court's assessment where, as here, the discretionary decision requires the district court to strike a balance among numerous non-dispositive and non-exclusive factors. *See Platt v. Minn. Mining & Mfg. Co.*, 376 U.S. 240, 243-44 (1964) (describing the ten factors that courts should consider when evaluating a motion to transfer, including "any other special elements which might affect the transfer"). Here, the District Court appropriately considered the *Platt* factors in a detailed decision, concluding that transfer was unwarranted in light of the "general rule" that "a criminal prosecution should be retained in the original district," the increased costs that transfer would impose on the government, and Thomas's ability during a New York-sited trial to call witnesses and access records located in St. Croix. *Parrilla*, 2014 WL 1621487, at *13-15. It rejected Thomas's claim that prosecuting him in New York would cause an unfair hardship to him, noting that Thomas was financially able to defend himself in New York. *Id.* And, when Thomas renewed his motion to transfer at trial, the District Court thoroughly examined his argument that the government's use of a patois expert was prejudicial and that transfer to St. Croix would alleviate the need to use such an expert. It reasonably concluded that a limiting instruction could cure any potential prejudice and that, in light of the fact that trial was underway, transfer was not warranted. Thomas has failed to identify any abuse of discretion in the District Court's decision, and, accordingly, we decline to vacate his conviction on this basis.

cocaine. After all, the last time that Tang Yuk had seen Jackson (two weeks earlier), Jackson had entrusted Tang Yuk with two kilograms of cocaine, worth more than $50,000, to sell, and the jury could reasonably expect Tang Yuk to understand that Jackson had other kilograms of his own to sell in addition to the two he had provided Tang Yuk: Jackson had invited Tang Yuk to join to the conspiracy and help further its ends, not to take over Jackson's entire role in it. Accordingly, when Tang Yuk encouraged Jackson on the telephone to "[d]o [his] thing," a jury was entitled to find it more likely than not that Tang Yuk was acting in furtherance of the conspiracy and thus, under the approach we endorsed in *Rommy*, committed an overt act in the Southern District of New York.

We observe further that, even if the jury did not find that Tang Yuk *himself* used the calls with Jackson to further their trafficking conspiracy, it could have found that the October 4 call put Tang Yuk on reasonable notice that at least one of his co-conspirators was likely to take an overt action in furtherance of the conspiracy by interacting with Jackson in the Southern District of New York. As described above, for example, the jury could reasonably have found that Thomas acted in furtherance of the conspiracy when, during a telephone call with Jackson, he urged Jackson to move quickly and bring his remaining cocaine and any sales proceeds from New York to Florida. Because Jackson had stated to Tang Yuk that he was in New York, it was reasonably foreseeable to Tang Yuk that actions in furtherance of the conspiracy would be taken there, if not by Tang Yuk himself, then by one of the individuals (Thomas or Parrilla) with whom Jackson had been working in Florida. *Cf. Lange*, 834 F.3d at 72-73 (finding that co-conspirators' acts and emails directed at E.D.N.Y. were reasonably foreseeable to defendants and thus that venue in E.D.N.Y. was proper).

21

#### d.  Parrilla

Because Parrilla did not join Thomas's and Tang Yuk's venue objections in the District Court, we review only for plain error the jury's findings regarding whether venue was proper as to him.[6] *Svoboda*, 347 F.3d at 484; *see also United States v. Muniz*, 60 F.3d 65, 67 (2d Cir. 1995). To show plain error, Parrilla must demonstrate "(1) error, (2) that is plain, [] (3) that affect[s] substantial rights . . . [and that] (4) the error seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." *Johnson v. United States*, 520 U.S. 461, 467 (1997) (internal quotation marks omitted). We find no error, much less a plain one, in the jury's finding that venue requirements were satisfied as to Parrilla.

Jackson did not directly inform Parrilla that he was in New York as he had Thomas and Tang Yuk. The jury could have reasonably inferred, however, that Thomas, who did speak with Jackson, informed Parrilla—the leader of the conspiracy—of Jackson's whereabouts. Thomas's statements during his October 16 phone call with Jackson suggest that Parrilla was using Thomas to threaten Jackson, by conveying the warning that things were "about to get ugly," with the ultimate goal of compelling Jackson to return pronto to Florida with the cocaine or proceeds of cocaine sales. *See* Supp. App'x at 199. The record thus supports a preponderance finding that Parrilla

---

[6]  Notably, we have found it "questionable whether the substantial contacts test should be applied" on appeal where the defendant fails to raise it in the district court, because the substantial contacts inquiry "is made only if the defendant argues that his prosecution in the contested district will result in a hardship to him, prejudice him, or undermine the fairness of the trial." *United States v. Lange*, 834 F.3d 58, 75 (2d Cir. 2016) (internal quotation marks omitted). It is unnecessary to resolve the question whether waiver of a venue objection moots the "substantial contacts" inquiry entirely, however, because Parrilla's co-conspirators' overt acts in the Southern District of New York are sufficient to create "substantial contacts" between Parrilla and that district. *See id.*; *see also supra*, Discussion Part A.3.a-c.

22

could have reasonably foreseen that an overt act—the October 16 threat, delivered over the telephone—in furtherance of the conspiracy would occur in New York.

**B.      Drug quantity**

Parrilla and Thomas argue that the District Court erred by calculating their Sentencing Guidelines ranges based on a finding that the conspiracy involved 80 kilograms of cocaine.[7] The Guidelines sentencing range for a convicted member of a conspiracy to possess or distribute narcotics depends on the quantity of drugs involved. *See* U.S.S.G. § 2D1.1(c); *United States v. Jones*, 30 F.3d 276, 286 (2d Cir. 1994). We review a district court's factual finding with respect to drug quantity for clear error, bearing in mind that "the judge who presided over the trial or over an evidentiary sentencing hearing is in the best position to assess the credibility of the witnesses, and her decisions as to what testimony to credit are entitled to substantial deference." *United States v. Norman*, 776 F.3d 67, 76, 78 (2d Cir. 2015). We note further that, because the district court's factual findings at sentencing may be supported by a simple preponderance of the evidence, *id.* at 76; *see also United States v. Jones*, 531 F.3d 163, 175 (2d Cir. 2008), a district court may find that the conspiracy involved a greater quantity of drugs than formed the basis for the jury's conviction, *see United States v. Florez*, 447 F.3d 145, 156 (2d Cir. 2006).

The record is replete with evidence, in the form of Jackson's testimony, that the conspiracy was focused on transporting and distributing 80 kilograms of cocaine. *See, e.g.*, TY App'x at 277, 279, 324, 447-48. Defendants do not dispute that the record contains this evidence, but contend that the District Court should not have credited

---

[7] Parrilla and Thomas were sentenced on January 7, 2015, and Tang Yuk was sentenced on January 8, 2015. The District Court properly calculated their Guidelines ranges according to "the Guidelines Manual in effect on the date that [each] defendant [was] sentenced," U.S.S.G. § 1B1.11(a): the November 2014 Guidelines Manual.

Jackson's testimony. This Court will not disturb a district court's credibility determinations, however, unless they are "clearly erroneous." *United States v. Ryan*, 806 F.3d 691, 693 (2d Cir. 2015). The District Court did not clearly err in relying on Jackson's testimony. The evidence to which Defendants point to impugn Jackson's credibility—evidence suggesting that Jackson falsely testified that he had not been involved in drug trafficking other than as part of the instant conspiracy and that he had not possessed a firearm since the 1990s—has no greater force than any other garden-variety impeachment evidence. Indeed, the District Court would have been justified in concluding that Jackson's testimony about drug quantity was *particularly* reliable: because Jackson himself was involved in the conspiracy, artificially inflating the quantities of cocaine possessed by his co-conspirators would have increased his *own* Guidelines range, as well. Although the District Court would have been permitted to conclude that Jackson testified untruthfully about all matters in the case, including the quantity of drugs involved in the conspiracy, Defendants' impeachment evidence did not compel it to do so.[8]

---

[8] For the same reason, we reject Thomas's argument that a new trial must be conducted because Jackson's testimony is "wholly unreliable." Thomas was certainly entitled to argue to the jury that Jackson's inconsistencies made him an unreliable witness, and that his testimony did not provide sufficient grounds for a conviction. The jury, in turn, was entitled to credit Jackson's averments despite Thomas's arguments. This, it did. In these circumstances, we will not disturb the jury's assessment. *See United States v. Parker*, 903 F.2d 91, 97 (2d Cir. 1990) ("Whether or not there is corroboration for an accomplice's testimony, the weight of the evidence is a matter for argument to the jury, not a ground for reversal on appeal, and we must defer to the jury's assessments of both the weight of the evidence and the credibility of the witnesses." (internal citation omitted)).

24

## C. Issues specific to Parrilla

### 1. Suppression of evidence

Before trial, Parrilla moved to suppress evidence obtained as a result of three allegedly unlawful searches: first, the DEA's wiretap of Parrilla's phones; second, the protective sweep search of the master bedroom in the Florida residence in which Parrilla was arrested; and third, the September 2012 search of Parrilla's business pursuant to a warrant. The District Court denied these motions without a hearing. *Parrilla*, 2014 WL 1621487, at *15 (denying all motions to suppress other than the one relating to the search of Parrilla's garage); *United States v. Parrilla*, No. 13 Cr. 360(AJN), 2014 WL 2111680, at *1 (S.D.N.Y. May 13, 2014) (denying Parrilla's motion to suppress evidence obtained during the search of his garage). We review the District Court's denial of a request for a suppression hearing for abuse of discretion, noting that an evidentiary hearing is required "if the moving papers are sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that contested issues of fact going to the validity of the search are in question." *In re Terrorist Bombings of U.S. Embassies in E. Afr.*, 552 F.3d 157, 165 (2d Cir. 2008).

### a. Wiretap of Parrilla's phones

Our review of a district court's decision to allow a wiretap pursuant to Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2510 *et seq.* ("Title III"), is circumscribed, extending only so far as to "ensur[e] [] that the facts set forth in the application were minimally adequate to support the determination that was made." *United States v. Concepcion*, 579 F.3d 214, 217 (2d Cir. 2009) (internal quotation marks omitted). A district judge may authorize interception of wire, oral, or electronic communications "within the territorial jurisdiction of the court in which the judge is sitting" if the government application for a wiretap meets certain criteria. 18 U.S.C.

25

§ 2518(3). The government must establish probable cause that a particular offense has been or will be committed and that communications about that offense will be intercepted, and it must demonstrate that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." *Id.* This last requirement (the "necessity" requirement) does not, however, reserve wiretaps as a last resort for law enforcement. *Concepcion*, 579 F.3d at 218. It requires only that agents "inform the authorizing judicial officer of the nature and progress of the investigation and of the difficulties inherent in the use of normal law enforcement methods." *Id.* (quoting *United States v. Diaz*, 176 F.3d 52, 111 (2d Cir. 1999)).

Applying the appropriately deferential standard of review to the District Court's decision to grant the government's March 12, 2013 application to intercept calls made on Parrilla's cell phone, we conclude that the application was adequate to support the authorization. The wiretap order states that the calls will be intercepted first in the Southern District of New York, satisfying the jurisdictional requirement. *See United States v. Rodriguez*, 968 F.2d 130, 136 (2d Cir. 1992). As to the necessity requirement, the DEA agent's affidavit in support of the wiretap application details, over ten pages, why ordinary investigative techniques would not suffice to uncover the information sought. In particular, the agent noted that Parrilla was unwilling to discuss narcotics trafficking activities on the phone with Jackson (whose conversations could be recorded because he was cooperating with law enforcement), that he seemed to have stopped sharing information with Thomas because of distrust arising from the search of his garage, and that none of the investigative methods used so far had yielded information about the source of the cocaine or the broader reaches of the drug trafficking organization of which Parrilla appeared to be a part. Moreover, the purpose of the wiretaps was not to provide evidence only about Parrilla and his co-defendants in this case. The

26

government sought evidence about a much broader drug trafficking organization in which Parrilla appeared to play a role.[9]

### b. Protective sweep incident to Parrilla's arrest

The Fourth Amendment's prohibition against warrantless searches is "subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967). A warrantless "protective sweep" of premises incident to an arrest, conducted "as a precautionary matter," is one such exception. *Maryland v. Buie*, 494 U.S. 325, 334-35 (1990). The permissible scope of a protective sweep depends on the conditions of the arrest: officers may "look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched" without probable cause or reasonable suspicion; broader searches, however, must be justified by "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Id.* at 334.

Parrilla contends that the sweep conducted in conjunction with his arrest falls outside the protective sweep exception to the warrant requirement because the officers searched the master bedroom in his residence, and that room did not "immediately adjoin[]" the room where he was arrested.[10] *Buie*, 389 U.S. at 334. The floor plan of the residence contradicts this assertion. The master bedroom, where the sweep took place,

---

[9] Because we find that Parrilla's wiretap challenge is meritless, we do not reach the government's alternative argument that it was waived.

[10] Although Parrilla also argues that the search was illegal because DEA agents waited until he was in a residence to execute the arrest, we are familiar with no authority—and Parrilla cites none—suggesting that law enforcement officers may execute an arrest warrant at a residence only if a public arrest is not possible.

27

appears on the plan as immediately adjacent to an area identified as the "LIVING/DINING ROOM." Parrilla App'x at 318. On the far side of the living room, opposite the entrance to the master bedroom, is the vinyl-floored entrance hallway, where Parrilla was arrested. Parrilla argues that we should not consider the bedroom as immediately adjoining the hallway because the distance between the two areas is greater than the "span of one room." Parrilla Br. at 33. Whether a given area constitutes a "room" for search purposes, however, depends not on a static measurement but on the manner in which a space is configured. The "hallway" was demarcated only by its vinyl flooring; the "living/dining room" was designated by carpeting. No wall divided the two, as the plan shows. Because the entrance "hallway" and the living room in the residence at issue formed a single, undivided space, anyone who exited the master bedroom into the living room would have been in the same undivided open space as the "hallway." Accordingly, it is entirely fair to say that the master bedroom "immediate[ly] adjoin[ed]" the room in which Parrilla was arrested. The protective sweep of that bedroom thus did not violate the Fourth Amendment. *Buie*, 494 U.S. at 334; *see also United States v. Lauter*, 57 F.3d 212, 216-17 (2d Cir. 1995) (concluding that a protective sweep was not impermissibly broad when it covered a back room that was adjacent to the room in which the defendant was arrested).

During a protective sweep, officers are entitled to seize items that are in plain view if they have "probable cause to suspect that the item is connected with criminal activity." *United States v. Gamble*, 388 F.3d 74, 76 (2d Cir. 2004) (per curiam); *see also Buie*, 494 U.S. at 330; *Lauter*, 57 F.3d at 217. Parrilla does not contest that the two cell phones at issue were in plain view when they were seized. He was arrested in the room immediately adjoining the bedroom in which the cell phones were located, and had been living in the house where he was arrested, as the agents knew. Accordingly, it was

28

reasonable for agents to believe that the two cell phones likely belonged to him. In light of the knowledge gained through their investigation into Parrilla's narcotics trafficking activities—including through wiretaps of cell phones on which he conducted trafficking-related business—the officers had probable cause to seize the cell phones as likely connected with his criminal activity.[11] *See United States v. Babilonia*, 854 F.3d 163, 180-81 (2d Cir. 2017) (finding that cell phones and an iPad could be seized under the plain view doctrine where prior investigation, including a wiretap, had revealed that the defendant's criminal activity involved the use of cell phones).

### c. Search of Parrilla's garage

Finally, Parrilla argues that the District Court should have suppressed evidence stemming from the search of his garage, because the warrant for that search was based in part on evidence resulting from two warrantless canine sniffs. Parrilla contends that those sniffs constituted "searches" and, therefore, that the government violated the Fourth Amendment through those initial canine sniffs.

When a Fourth Amendment violation leads the government to evidence of a crime, the "exclusionary rule" usually precludes the government from introducing that evidence at trial. *United States v. Stokes*, 733 F.3d 438, 443 (2d Cir. 2013). Because this rule is aimed at deterring unconstitutional conduct and does not reflect an "individual

---

[11] We are similarly unconvinced by Parrilla's argument that *Riley v. California*, 134 S. Ct. 2473 (2014), creates an exception from the plain view doctrine for cell phones because of their immense storage capacities. *See, e.g.*, *United States v. Babilonia*, 854 F.3d 163, 180-81 (2d Cir. 2017). If, as we conclude, the phones were within plain view of law enforcement agents while they were conducting a valid protective sweep, they were subject to seizure irrespective of the amount of information they contain. To the extent that modern cell phones present unique Fourth Amendment concerns because of the quantity and sensitivity of information they contain, the requirement that law enforcement officials obtain a warrant before they search the contents of a phone—a requirement which, Parrilla admits, the government satisfied here—adequately protects that information. *See Riley*, 134 S. Ct. at 2489.

29

right," however, the Supreme Court has instructed that we not apply it when application would not "result[] in appreciable deterrence." *Herring v. United States*, 555 U.S. 135, 141 (2009) (noting that "the benefits of deterrence must outweigh the costs" when applying the exclusionary rule). The Court has thus refused to exclude evidence obtained pursuant to an invalid search warrant if law enforcement officers' reliance on the defective warrant was "objectively reasonable"—creating a "good-faith exception" to the exclusionary rule. *Davis v. United States*, 564 U.S. 229, 241 (2011) ("[T]he harsh sanction of exclusion should not be applied to deter objectively reasonable law enforcement activity."). To determine the "objective reasonableness" of officers' reliance on a warrant, we look to the governing law that existed at the time that the warrant was executed—here, September 2012. *See United States v. Aguiar*, 737 F.3d 251, 261-62 (2d Cir. 2013).

In September 2012, DEA agents' reliance on the warrant authorizing the "sneak and peek" search was objectively reasonable and, thus, evidence resulting from that search should not have been excluded even if it might now be determined that the government relied on evidence gathered in an unconstitutional search to obtain the warrant. When the DEA agents executed the warrant at Parrilla's garage in September 2012, a reasonable law enforcement officer in Florida would not have believed that the warrantless canine sniffs that, in part, underlay the warrant's issuance violated the Fourth Amendment. *See Parrilla*, 2014 WL 2111680, at *1. To the contrary, a reasonable law enforcement officer in Florida would have justifiably relied upon the Eleventh Circuit's declaration in *United States v. Glinton*, 154 F.3d 1245, 1257 (11th Cir. 1998), that "a canine sniff is not considered a 'search' for Fourth Amendment purposes" and thus is exempt from the warrant requirement. Pre-2012 Supreme Court cases finding that the use of electronic listening devices, *see Katz v. United States*, 389 U.S. 347 (1967), and

30

thermal-imaging devices, *see Kyllo v. United States*, 533 U.S. 27 (2001), can constitute a "search" for Fourth Amendment purposes, do not compel a different conclusion.[12] Neither *Katz* nor *Kyllo* would have led reasonable law enforcement officers to disregard *Glinton* and conclude that a facially valid warrant was invalid because it was based in part on a warrantless canine sniff. The officials responsible for the warrant's execution could have easily concluded, as the officers here did, that the warrant authorizing the search was valid.

Because the search of Parrilla's garage would fall within the good-faith exception regardless of the constitutional validity of the warrantless canine sniffs that provided the predicate for the warrant, we need not determine whether the government's reliance on the canine sniffs themselves violated Parrilla's reasonable expectation of privacy in his garage.

**2.    Witness intimidation**

Parrilla contends on appeal that the District Court erred in (1) allowing Jackson to testify about Parrilla's attempts to intimidate him in prison, and (2) permitting the jury to infer from that testimony that Parrilla believed himself to be guilty of the drug trafficking offense. Jackson testified that, on three separate occasions, two inmates approached him in prison after his arrest in New York. They asked him on one occasion whether he knew Parrilla and, on another, told him that Parrilla "said what's up."

---

[12] Justice Kagan's concurrence in *Florida v. Jardines*, 569 U.S. 1 (2013), suggests that canine sniffs might constitute a search for Fourth Amendment purposes. *Id.* at 14-15 (Kagan, J., concurring) (police officers were not entitled to come to a suspect's door "with a super-sensitive instrument"—a dog's nose—"to detect things inside that they could not perceive unassisted"). The *Jardines* majority expressly declined to reach that question, however. *Id.* at 11. Some courts since *Jardines* have taken up Justice Kagan's suggestion. *See, e.g.*, *United States v. Whitaker*, 820 F.3d 849, 852-54 (7th Cir. 2016). Because *Jardines* was issued after the search in question occurred, however, it could not have affected a reasonable officer's evaluation of the legitimacy of this warrant.

31

These interactions made him "nervous" about his cooperation with the government, he averred. Parrilla App'x at 577. The District Court gave the following relevant instruction to the jury:

> If you conclude there is evidence that Mr. Parrilla attempted to intimidate or coerce Mr. Jackson, a witness whom he believed was to be called by the government against him, I instruct you that the defendants are not on trial for that conduct, and you may not consider the evidence as a substitute for proof of guilt in this case.

> However, if you find that Mr. Parrilla did attempt to intimidate or coerce Mr. Jackson, a witness whom he believed the government was going to call against him, you may, but are not required to, infer that Mr. Parrilla believed that he was guilty of the crime for which he is here charged.

> Whether or not evidence of Mr. Parrilla's attempted intimidation or coercion of a witness shows that Mr. Parrilla believed that he was guilty of the crime for which he is now charged and the significance, if any, to be given to such evidence, is for you to decide.

Parrilla App'x at 805. Parrilla argues that the District Court erred in permitting Jackson to testify about these incidents, because (he asserts) the inmates' statements are inadmissible hearsay. He also contends that the District Court's jury instruction regarding intimidation was unacceptably suggestive.[13]

Parrilla admits that he did not raise his hearsay objection during the trial. Parrilla Br. at 46. Accordingly, we review the admission of Jackson's testimony for plain error, *United States v. Inserra*, 34 F.3d 83, 90 n.1 (2d Cir. 1994), reversing only if a "miscarriage of justice" would otherwise result, *United States v. Frady*, 456 U.S. 152, 163 n.14 (1982).

---

[13] Parrilla's additional argument that Jackson's testimony violated his rights under the Confrontation Clause is meritless, because the unknown inmates' statements were not intended to be used as part of an investigation or prosecution and accordingly are not correctly considered to be testimonial. *See, e.g.*, *Ohio v. Clark*, 135 S. Ct. 2173, 2180 (2015) (noting that, for Confrontation Clause purposes, "the question is whether, in light of all the circumstances, viewed objectively, the primary purpose of the conversation was to create an out-of-court substitute for trial testimony" (internal quotation marks omitted)).

Assuming, without deciding, that Jackson's testimony was inadmissible hearsay as to the other inmates' alleged statements, we conclude that it affected neither Parrilla's substantial rights nor the fairness, integrity, or public reputation of judicial proceedings, and that the District Court accordingly did not plainly err by admitting it. *See Johnson v. United States*, 520 U.S. 461, 467 (1997). A wealth of other evidence supported Parrilla's conviction. The jury heard recordings from Parrilla's wiretapped calls, saw physical evidence retrieved from the search of his business, and listened to Jackson's eyewitness testimony. We see no reason to conclude that the jury credited Jackson's testimony about the import of the unnamed inmates' communications and convicted Parrilla substantially based on inferences drawn from that testimony, while not crediting Jackson's testimony detailing Parrilla's overall involvement in the conspiracy. The latter testimony provided a more-than-sufficient basis for conviction.

We review *de novo* the jury instruction regarding consciousness of guilt, to which Parrilla did object in the District Court. *United States v. Roy*, 783 F.3d 418, 420 (2d Cir. 2015) (per curiam). "A jury instruction is erroneous if it misleads the jury as to the correct legal standard or does not adequately inform the jury on the law." *Id.* We reject the challenge: the jury instruction here did neither. The instruction did not, as Parrilla argues, create a presumption of guilt against him. On the contrary, the District Court explicitly instructed the jury that it was entitled to draw, or not to draw, the inference that Parrilla was conscious of his guilt. An instruction that merely identifies a permissible inference to the jury, without more, does not disturb the presumption of innocence. *See, e.g.*, *United States v. Strother*, 49 F.3d 869, 877 (2d Cir. 1995) (rejecting challenge to jury instruction that it was "[o]rdinarily . . . reasonable to infer" that a false explanation of innocence is evidence of guilt).

33

### 3. Offense level enhancements

Parrilla also challenges three enhancements that the District Court applied over his objections when calculating his sentence: (1) a two-level enhancement for making a credible threat to use violence under U.S.S.G. § 2D1.1(b)(2); (2) a two-level enhancement for witness intimidation under U.S.S.G. § 2D1.1(b)(15)(D); and (3) a four-level enhancement for being an "organizer or leader" of the criminal activity under U.S.S.G. § 3B1.1(a). As discussed above, we review a District Court's factual findings in calculating the appropriate Guidelines range for clear error. *Norman*, 776 F.3d at 76.

The District Court applied § 2D1.1(b)(2)'s two-level enhancement for making a credible threat to use violence to Parrilla, based on his intimidation of Jackson in prison through other inmates as well as statements during phone calls with Tang Yuk in which Parrilla referenced driving a car over Thomas and predicted Thomas's and Jackson's impending deaths. Parrilla argues that, in applying the enhancement, the District Court took his statements out of context, making them sound more threatening than they actually were. He offers alternative explanations for his statements, arguing that they were "conditional," "philosophical[]," and "mere puffery." Parrilla Br. at 56-57. That the statements in question could be interpreted as innocent hyperbole, however, does not compel the District Court to draw such a conclusion. Nor was the District Court barred from inferring a threat from Jackson's testimony that inmates had approached him in prison and purported to relay messages from Parrilla. The District Court reasonably took these as both a credible threat to use violence and witness intimidation, giving rise to an additional two-level enhancement pursuant to § 2D1.1(b)(15)(D).[14] We identify no clear error in its decision to do so.

---

[14] Even if Jackson's testimony on this topic was hearsay, as Parrilla argues, the District Court was nevertheless permitted to consider it in calculating Parrilla's Guidelines range. *United States v. Martinez*, 413 F.3d 239, 242-43 (2d Cir. 2005).

34

The District Court also subjected Parrilla to a four-level aggravating role enhancement for being "an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(a). The relevant commentary to this Guidelines section advises, "In assessing whether an organization is 'otherwise extensive,' all persons involved during the course of the entire offense are to be considered. Thus, a fraud that involved only three participants but used the unknowing services of many outsiders could be considered extensive." U.S.S.G. § 3B1.1 cmt. 3 (internal quotation marks omitted). The operative inquiry under the "otherwise extensive" prong is "whether the scheme was the functional equivalent of one involving five or more knowing participants." *United States v. Kent*, 821 F.3d 362, 369 (2d Cir. 2016) (internal quotation marks and emphasis omitted).

The District Court's factual conclusion that the scheme involved five or more participants—Parrilla, Thomas, Tang Yuk, Jackson, and Fulton—was not clearly erroneous. Although Parrilla emphasizes that he was unaware of Fulton's involvement, the Guidelines require only that the conspiracy *actually involve* five or more participants, not that the organizer be aware of all participants. To the contrary, the relevant commentary specifies that a defendant merits this adjustment if he was the "organizer [or] leader . . . of *one or more other* participants." U.S.S.G. § 3B1.1 cmt. 2 (emphasis added). Here, Parrilla asserted organizational control over at least Jackson's conspiracy-related activities when he instructed Jackson to keep 27 kilograms of cocaine on consignment and deliver the remaining 53 kilograms to Parrilla. Nor does it matter that the record suggests that Fulton became involved in the conspiracy only when Jackson was selling his portion of the 80 kilograms of cocaine. The "five participants" rule includes "all persons involved during the course of the entire offense." *Id.* at cmt. 3; *see also Kent*, 821 F.3d at 310 n.8 (finding no "temporal limitation on counting the number of

35

participants"). And even if Fulton were not a participant, the District Court did not clearly err in finding that the trafficking conspiracy was "otherwise extensive," in light of Defendants' circumvention of border security and their interstate distribution of cocaine, which required assistance from persons other than the co-conspirators.

The record also supports the District Court's finding that Parrilla was an "organizer or leader" of the trafficking conspiracy. Parrilla decided how the imported cocaine would be distributed—keeping 53 kilograms of cocaine for himself, and giving 27 kilograms to Jackson on consignment—and determined what the consignment price per kilogram would be for his co-conspirators. He also took a leading role after Jackson's disappearance, communicating threats through Thomas and directing Jackson to return to Florida posthaste. Accordingly, the District Court did not err in imposing a four-level enhancement on Parrilla for his leading role.

### D.      Issues specific to Tang Yuk

#### 1.      Sufficiency of evidence as to drug quantity

Tang Yuk argues that the evidence was insufficient to convict him for a conspiracy involving five or more kilograms of cocaine. He contends that the evidence showed, at most, that he was involved in a separate conspiracy with Jackson to distribute two kilograms of cocaine. As with Defendants' sufficiency challenge to venue, we review this post-conviction challenge *de novo*, drawing all inferences in the government's favor in light of the jury's verdict.[15] *See United States v. Pierce*, 785 F.3d

---

[15] In a footnote, Tang Yuk argues that the jury's verdict as to him is "ambigu[ous]" because the foreperson checked two boxes with respect to the quantity of drugs, in violation of the District Court's instruction to check one of the two boxes, and because the two boxes that were checked—"between 500 grams and five kilograms" and "five kilograms or more"—are "incapable of rational harmonization." Tang Yuk Br. at 16 n.8 (citing TY App'x at 668). This description of the jury instructions, however, is inaccurate in one important respect. As reflected in the transcript of the District Court reading the jury instructions (the parties do not appear to have provided the actual verdict form in their appendices, and they cite only to the

36

832, 837-38 (2d Cir. 2015). The burden on a defendant bringing a sufficiency challenge after a jury verdict is "heavy." *United States v. Anderson*, 747 F.3d 51, 59 (2d Cir. 2014) (quoting *United States v. Aguilar*, 585 F.3d 652, 656 (2d Cir. 2009)).

The evidence at trial was sufficient for the jury to conclude that Tang Yuk was involved in the conspiracy to distribute 80 kilograms of cocaine. We cannot say that no reasonable jury could reach this decision. The record contains nothing to suggest that Tang Yuk could reasonably have believed that, after warning Tang Yuk that he anticipated "get[ting] some work," Jackson had given him *all* the cocaine that he possessed from the shipment. TY App'x at 257. Even if Tang Yuk somehow did believe that the entire conspiracy was limited to two kilograms initially, however, subsequent events made it clear that he was part of a much larger drug trafficking operation. For example, when Tang Yuk complained to Jackson that his two kilograms of consignment cocaine were underweight and that he would therefore receive a lower price for the cocaine from his buyers than he had expected, Jackson told Tang Yuk that he (Jackson) had to get a particular price for each kilogram of cocaine that Parrilla had given him. The jury was entitled to conclude that this interchange would have suggested to Tang Yuk that his two kilograms were part of a larger quantity, some retained by Jackson, for which Parrilla expected Jackson to pay him. Moreover, any expectation that the conspiracy involved more cocaine than the two kilograms he had received from Jackson would have been confirmed when, after Jackson's arrest, Tang Yuk began dealing

transcript), the jury was instructed to resolve whether the conspiracy involved "(i) 500 grams or more of mixtures or substances containing a detectable amount of cocaine, or (ii) five kilograms or more of mixtures or substances containing a detectable amount of cocaine." TY App'x at 667. The District Court did not explicitly direct the jury to pick only one of those boxes. Since both quantity ranges—"500 grams or more" or "five kilograms or more"—have only minimums, and neither has an upper limit, the jury's decision to check both boxes is, in fact, capable of "rational harmonization": Tang Yuk was involved in a conspiracy involving five kilograms or more of cocaine, and that amount includes the lesser amount of "500 grams or more" of the drug.

directly with Parrilla and Thomas. Contrary to his insistence that he was involved only in a side conspiracy with Jackson, Tang Yuk participated in numerous calls with the other members of the conspiracy, told Jackson that he had attended a meeting with Thomas and Parrilla during which they discussed drug pricing, and, surveilled by DEA agents, attended a meeting with his two co-defendants in St. Croix on February 4, 2013, before the final arrests of all three.

Even if Tang Yuk's conspiratorial activities might be seen in their early stages as limited to selling the two kilograms he received from Jackson, the jury could reasonably have concluded that Thomas and Parrilla—who suspected that Jackson had absconded with his portion of the cocaine—implied to or told Tang Yuk that Jackson had possessed a significant quantity of cocaine on consignment when he disappeared. From this, Tang Yuk could readily have concluded that the total quantity of cocaine at issue was much more than the two kilograms he initially received on consignment. The evidence of Tang Yuk's ongoing involvement with Parrilla and Thomas after Jackson's departure demonstrates that he was willing to continue with the conspiracy after being made aware of the larger scheme. Even if Tang Yuk did not know "all of the details of the conspiracy," the jury could reasonably conclude that he knew the "general nature and extent" of the conspiracy. *See United States v. Torres*, 604 F.3d 58, 65 (2d Cir. 2010).

Tang Yuk's reliance on *United States v. Richards*, 302 F.3d 58 (2d Cir. 2002), is unavailing. In that case, the district court found that the record contained insufficient evidence to convict the defendant, Rudolph Anderson, of a narcotics trafficking conspiracy involving 1,000 kilograms or more of marijuana, and therefore reduced the operative amount of marijuana to 100 kilograms or more. *Id.* at 64-65. Witnesses had testified that they had seen Anderson deal in only 40 pounds (approximately 18 kilograms) of marijuana. *Id.* at 64, 69-70. On appeal, we found the evidence sufficient to

38

support Anderson's conviction for the conspiracy involving 100 kilograms or more of marijuana, as the district court had ruled. (The government did not appeal the district court's reduction.) Our affirmance was based on evidence that the defendant had received *some* marijuana for resale, coupled with telephone records showing that he had spoken with other members of the conspiracy on many occasions and wiretapped calls demonstrating "some knowledge" of the marijuana distribution operation. *Id.* at 69-70. Tang Yuk's position with regard to the 80 kilograms of cocaine at issue here is comparable to Anderson's position *vis à vis* the 100 kilograms of marijuana: in addition to obtaining some portion of the overall cocaine for resale, Tang Yuk spoke with his co-conspirators by phone and in person in a manner that suggests knowledge of a broader distribution scheme. This evidence is sufficient to support the jury's finding as to Tang Yuk.

### 2. *Brady/Giglio* material

On appeal, Tang Yuk for the first time raises a challenge to the format in which the government produced files from Jackson's cell phone, arguing that the government's production violated his rights under *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972). We review an unpreserved *Brady* claim for plain error. *See United States v. Catone*, 769 F.3d 866, 871 (4th Cir. 2014); *United States v. Mota*, 685 F.3d 644, 648 (7th Cir. 2012).

In *Brady*, the Supreme Court held that the government has a constitutional duty to timely disclose material, exculpatory evidence to criminal defendants. The Court extended that production duty in *Giglio*, 405 U.S. at 154, to cover evidence that could be used to impeach a government witness. To establish a *Brady* or *Giglio* violation, "a defendant must show that: (1) the government, either willfully or inadvertently, suppressed evidence; (2) the evidence at issue is favorable to the defendant; and (3) the

39

failure to disclose this evidence resulted in prejudice." *United States v. Coppa*, 267 F.3d 132, 140 (2d Cir. 2001). The government's duty to disclose generally does not include a "duty to direct a defendant to exculpatory evidence within a larger mass of disclosed evidence." *United States v. Skilling*, 554 F.3d 529, 576 (5th Cir. 2009), *rev'd in part on other grounds by Skilling v. United States*, 561 U.S. 358 (2010). Some courts have reasonably suggested that burying exculpatory material within a production of a voluminous, undifferentiated open case file might violate the government's obligations. *Cf. United States v. Ferguson*, 478 F. Supp. 2d 220, 241 (D. Conn. 2007) (Droney, *J.*) (rejecting claim that the government had produced a "document dump" that violated its *Brady* obligations). Reversal for failure to turn over such evidence is required if the evidence is "material"—that is, in the *Brady* context, if there is a "reasonable probability" that disclosure would have changed the outcome of the case, or where the suppressed evidence "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles v. Whitley*, 514 U.S. 419, 434-35 (1995).

Three months before trial of the instant conspiracy was scheduled to begin, the government produced a disc to Defendants containing thousands of text and image files extracted from Jackson's cell phone, as well as a "Report" prepared by the government containing summary information about the files and thumbnail images of some of the files. Later, during trial, while on a break during Jackson's cross-examination, Thomas's counsel discovered that some of the images retrieved from Jackson's phone showed a suitcase filled with narcotics and a firearm lying on the bed. The metadata associated with the images suggested that the photos were taken on August 20, 2012—*before* Jackson obtained the drugs that are the subject of this prosecution. Tang Yuk argues now that these photos constituted material impeachment evidence, because they contradicted Jackson's testimony that he had not been involved in any other drug

40

transactions in 2012 and had not owned a firearm since 1997. Tang Yuk further contends that the photos also suggest that the 25 kilograms of cocaine seized during Jackson's arrest were not involved in Tang Yuk's conspiracy with Jackson. The government's failure to provide the cell phone files in an easily accessible, searchable format constitutes a violation of its *Brady* and *Giglio* obligations, requiring reversal or retrial, in his view.

Assuming, without deciding, that the flagged photos amounted to material evidence potentially favorable to him, Tang Yuk has failed to identify any *Brady* or *Giglio* violation by the government, much less one that rises to the level of plain error cognizable on appeal. If the format in which the files were produced rendered them as unusable as he now claims, Tang Yuk offers no explanation for his failure to object to that format before trial. Nor does Tang Yuk explain why the government should bear the full burden of reviewing and characterizing each document within a voluminous evidentiary record: because the allegedly exculpatory files are images, not text files, government attorneys would have had to characterize and tag each image to create the "organized and searchable" database that Tang Yuk demands, Tang Yuk Br. at 38. Although *Brady* and *Giglio* forbid the government from failing to disclose evidence that would aid a defendant's case, it hardly can be said to be plain error irremediably infecting the trial for the District Court not to identify a *Brady* violation in these circumstances.

It is unnecessary, moreover, for us to decide the extent to which the government must shoulder the organizational burdens stemming from voluminous records potentially containing *Brady* or *Giglio* material. *Cf. Skilling*, 554 F.3d at 576-77 (noting, without deciding, the open question whether providing "several hundred million pages" to a defendant, which would have taken "scores of attorneys, working *around-*

41

*the-clock*[,] several *years*" to review, would constitute a *Brady* violation). Even if, in utilizing this production format, the government somehow violated its related constitutional obligations, Tang Yuk fails to identify prejudice resulting from that violation. Defendants flagged the evidence at issue during trial and actually used it to impeach Jackson. That the jury found Jackson credible despite Defendants' best efforts to impeach him does not constitute cognizable prejudice, nor do Tang Yuk's arguments suggest that earlier or more targeted disclosure would have changed the jury's evaluation of Jackson's credibility. Accordingly, we decline to vacate Tang Yuk's conviction on these grounds.

### 3. Improper comments during summation

Reversal of a conviction on the basis of a comment during summation is necessary only if the comment, when viewed in the context of the entire trial, was "so severe and significant as to have substantially prejudiced [the defendant], such that the resulting conviction was a denial of due process." *United States v. Williams*, 690 F.3d 70, 75 (2d Cir. 2012) (internal quotation marks and citations omitted). Our Circuit has identified three factors that govern whether an improper summation comment "substantially prejudiced" a defendant: "(1) the seriousness of the misconduct, (2) the measures adopted by the trial court to cure the misconduct, and (3) the certainty of conviction absent the improper statements." *United States v. Banki*, 685 F.3d 99, 120 (2d Cir. 2012) (internal quotation marks omitted).

During summation, one of the Assistant United States Attorney trying the case referred to a call between Tang Yuk and Parrilla in which Tang Yuk told Parrilla that he had learned from a Customs and Border Patrol (CBP) agent at the St. Croix airport that he (Tang Yuk) was under investigation for drug trafficking. The AUSA said:

> Ladies and gentlemen, this [call] is powerful evidence of the conspiracy
> between Parrilla and Tang Yuk. As you learned during this trial, this drug

42

organization was international in scope. Its members were sophisticated, and they had access to borders. In this call, Tang Yuk is using a contact in customs to get sensitive, secret law enforcement information about what is going on in an investigation of him.

Although the District Court initially overruled Parrilla's counsel's objection to this statement, it subsequently sustained Tang Yuk's objection. Noting an absence of evidence that Tang Yuk had actively sought out confidential information from his CBP contact, the District Court found that the government's suggestion that Tang Yuk had improperly requested such information ran "counter to . . . permissible inferences" that could be drawn from the call. At the request of Tang Yuk's counsel, the District Court then gave a limiting instruction advising the jury that the arguments of counsel, including summation, are not evidence. Tang Yuk did not object to the Government's comments in the district court other than to request the limiting instruction that was given; accordingly, the plain error standard applies. *United States v. Williams*, 690 F.3d 70, 75 (2d Cir. 2012).

In light of the rest of the evidence showing Tang Yuk's relationship to the conspiracy—and in light of the uncontested contents of the call itself—we conclude that the government's comments were not so significant as to violate Tang Yuk's due process rights and to require reversal, even accepting the District Court's ultimate determination that the comment was improper. The conduct implied by the government's statement—that Tang Yuk intentionally obtained "sensitive, secret law enforcement information" from a CBP contact—did not bear directly on his culpability for the charged drug trafficking offense. Moreover, if the jury found Jackson's testimony credible—which the guilty verdicts as to all defendants suggests that it did—Tang Yuk's conviction would have been highly likely whether or not the jury believed

43

that he had improperly sought confidential information from a CBP agent. Accordingly, this remark does not require overturning Tang Yuk's conviction.

### 4. Offense level reduction

Finally, Tang Yuk argues that the District Court erred in failing to grant a downward adjustment for his "minor" or "minimal" role in the conspiracy. As explained above, we review the District Court's findings of fact at sentencing, including those related to sentencing adjustments, for clear error. *See United States v. Yu*, 285 F.3d 192, 199 (2d Cir. 2002).

Section 3B1.2 of the Sentencing Guidelines offers a four-level downward adjustment for a defendant who plays a "minimal" role in criminal activity; a two-level downward adjustment for a defendant who plays a "minor" role; and a three-level downward adjustment for a role that is somewhere in between. A "minimal" role adjustment is appropriate for a defendant who is "plainly among the least culpable of those involved in the conduct of a group," and a "minor" role adjustment is appropriate for a defendant "who is less culpable than most other participants." *See* U.S.S.G. § 3B1.2, cmts. 4, 5. "On numerous occasions we have reiterated that a reduction pursuant to U.S.S.G. § 3B1.2 will not be available simply because the defendant played a lesser role than his co-conspirators; to be eligible for a reduction, the defendant's conduct must be 'minor' or 'minimal' as compared to the average participant in such a crime." *United States v. Carpenter*, 252 F.3d 230, 235 (2d Cir. 2001) (internal quotation marks omitted).[16]

---

[16] We note that Amendment 794, which became effective in November 2015, modified significantly the factors that a district court in this Circuit should consider in deciding whether to apply the reduction. U.S.S.G. Supplement to app. C, amend. 794 (amending U.S.S.G. § 3B1.2 cmt. N.3(c)). In particular, Amendment 794 clarified that a role reduction is appropriate if the defendant was "substantially less culpable than the average participant in the criminal activity," and that the "average participant" specifically refers to the defendant's "co-participants in the case at hand." *Id.* The Sentencing Commission's interpretation of § 3B1.2 in Amendment 794—to which we assign controlling weight, *United States v. Lacey*, 699 F.3d 710, 716 (2d Cir. 2012)—

Tang Yuk contends that the District Court erred in finding that he was a full and knowing participant in the conspiracy and in failing to conduct an analysis of his culpability relative to that of his co-conspirators. As described above, however, the record contained sufficient evidence to demonstrate Tang Yuk's knowledge of and participation in the full scope of the conspiracy. The District Court made detailed findings about Tang Yuk's role in the conspiracy and found that Tang Yuk progressed from being a conspirator whom the others "kept somewhat in the dark" to a full-fledged conspirator who was "on the same page" as Parrilla and Thomas. TY App'x at 872-75. Based on these factual findings and its findings with respect to the challenged drug quantity, the District Court's conclusion that Tang Yuk's role was not "minor" or "minimal" compared to that of the average participant in a narcotics-trafficking conspiracy was not clearly erroneous.

**E.     Issues specific to Thomas**

Thomas argues that he is entitled to a new trial because, he asserts, Jackson perjured himself during the trial. To establish his entitlement to a new trial on the ground that a witness committed perjury, a defendant must show that "(i) the witness actually committed perjury; (ii) the alleged perjury was material; (iii) the government

undercuts the interpretation of § 3B1.2 that we articulated in earlier case law. *See, e.g.*, *United States v. Carpenter*, 252 F.3d 230, 235 (2d Cir. 2001). The November 2015 Guidelines were not in operation at the time of Tang Yuk's January 8, 2015 sentencing, however, and the District Court properly applied the November 2014 Guidelines at that time. U.S.S.G. § 1B1.11(a) ("The court shall use the Guidelines Manual in effect on the date that the defendant is sentenced."). Accordingly, the District Court was required to consider Tang Yuk's culpability relative to the average participant in a generic drug distribution conspiracy, not his actual co-conspirators, when deciding whether to grant the minor role reduction. Tang Yuk is not entitled to the benefit of Amendment 794—which has not been given retroactive application, U.S.S.G. § 1B1.10(d)—on direct appeal. *United States v. Caceda*, 990 F.2d 707, 710 (2d Cir. 1993) ("Congress did not wish appellate courts on direct review to revise a sentence in light of the changes made by the [Sentencing] Commission." (quoting *United States v. Colon*, 961 F.2d 41, 46 (2d Cir. 1992))).

45

knew or should have known of the perjury at the time of trial; and (iv) the perjured testimony remained undisclosed during trial." *United States v. Josephberg*, 562 F.3d 478, 494 (2d Cir. 2009) (internal quotation marks omitted). Where the alleged perjury came to light during the trial and the defendant had ample opportunity to undermine the witness's credibility, "we will not supplant the jury as the appropriate arbiter of the truth and sift falsehoods from facts." *United States v. Zichettello*, 208 F.3d 72, 102 (2d Cir. 2000) (internal quotation marks omitted).

Thomas identifies the following statements in Jackson's testimony as false:

- That [Jackson] helped Thomas pack cocaine into a crate on September 10, 2012;
- That Thomas told him to fly to St. Croix to meet with him at a time when airline records showed that Thomas was in Florida with his family;
- That he never possessed a gun since he was a police cadet in the 1990s;
- That he had not engaged in drug activity since his release from prison in 2009 until he joined the conspiracy with the Defendants in 2012; and
- That he had never seen the photographs of the cash, gun, and drugs found in his phone although the photographs were taken with his phone.

Thomas Br. at 32. With regard to the dates on which Thomas and Jackson were together in St. Croix, Thomas fails to prove that Jackson's testimony constituted perjury, that the government knew or should have known about the alleged perjury, or that the alleged perjury was material. On the contrary, during cross-examination, Jackson made clear that he was generally unable to recall specific dates because he had been "back and forth to St. Croix." TY App'x at 446-48. Moreover, even if Jackson's statements with regard to his involvement with guns and drugs, and as to the meaning of the photographs of those items, were false, the jury had sufficient information on those issues to evaluate Jackson's credibility: Thomas's counsel cross-examined Jackson about

46

those issues, specifically. We therefore see no reason to overturn the jury's verdict on this ground.

Finally, Thomas argues that his Sixth Amendment rights were violated when the District Court limited his cross-examination of Jackson. Thomas, however, has failed to identify any specific line of questioning that the District Court precluded him from pursuing. Thomas claims generally that he was unable to "explor[e] in detail Jackson's prior criminal convictions" and to plumb Jackson's "potential nefarious motives for [] cooperation." Thomas Br. at 36. Contrary to these assertions, the record reflects that Thomas pursued an extensive cross-examination of Jackson in which he probed Jackson's prior convictions, prior criminal conduct, and truthfulness generally. Accordingly, we reject this challenge as meritless.

## CONCLUSION

Even in our highly interconnected world, some prosecutions may stretch the boundaries of criminal venue too far. These, however, are not among them. The judgment of the District Court is **AFFIRMED**.

DENNY CHIN, Circuit Judge:

I respectfully dissent.

The three defendants, Kirk Tang Yuk, Felix Parrilla, and Gary Thomas, were convicted of conspiracy to distribute and possess with intent to distribute cocaine in the Southern District of New York (the "SDNY"). They did not set foot in the SDNY, however, or anywhere near, nor did they send any narcotics into the SDNY. Rather, as the evidence showed, their narcotics conspiracy operated in St. Croix and Florida.

As the Government's proof established, the conspiracy's only contacts with the SDNY were: (1) a co-conspirator (Jackson) committed an overt act in the SDNY by driving his share of the conspiracy's drugs over the Verrazano-Narrows Bridge, which lies within the joint jurisdiction of the SDNY and the Eastern District of New York (the "EDNY");[1] and (2) after he was arrested

---

[1]     *See* 28 U.S.C. § 112(b) ("The [SDNY] comprises the counties of Bronx, Dutchess, New York, Orange, Putnam, Rockland, Sullivan, and Westchester and concurrently with the [EDNY], the waters within the [EDNY]."); *United States v. Tzolov*, 642 F.3d 314, 320 (2d Cir. 2011) ("[V]enue for a conspiracy may be laid in a district through which conspirators passed in order to commit the underlying offense."); *United States v. Ramirez-Amaya*, 812 F.2d 813, 816 (2d Cir. 1987) (citing 28 U.S.C. § 112(b)) (explaining the Narrows is "a body of water that lies within the joint jurisdiction of the Southern and Eastern Districts of New York").

in the EDNY and taken by agents into Manhattan, Jackson made phone calls -- at the agents' behest -- to the defendants, during which he said he was in "New York." Indeed, Jackson testified at trial that the agents specifically "instructed [him] to say that [he was] in New York," "[t]o bring the word New York out" during his call with Tang Yuk, and to make sure that he told Thomas he was in New York even though Thomas did not ask for his location. Tr. 1298-99.

As the majority acknowledges, the question thus becomes whether it was reasonably foreseeable to the defendants that an act in furtherance of the conspiracy would occur in the district of venue. *United States v. Rommy*, 506 F.3d 108, 123 (2d Cir. 2007) ("the overt act's occurrence in the district of venue [must] have been reasonably foreseeable to a conspirator"); *see also United States v. Davis*, 689 F.3d 179, 189 (2d Cir. 2012) (to prove venue, Government must show that "it was more probable than not that [defendant] understood the likelihood" that act in furtherance of offense would take place in district of prosecution). In my view, the Government failed to prove venue, even by the lower preponderance of the evidence standard. *See United States v. Lange*, 834 F.3d 58, 69 (2d Cir. 2016) ("The Government bears the burden of proving venue by a preponderance of the evidence.").

Neither Jackson's drive across the bridge over the Narrows nor the phone calls from Manhattan was sufficient to establish venue as to these defendants, because the evidence did not show that Jackson's conduct in taking the conspiracy into the SDNY -- to the extent that he did -- was reasonably foreseeable to them.

## I. *Verrazzano-Narrows Bridge*

Jackson's drive across the Verrazzano-Narrows Bridge did not establish venue in the SDNY as to defendants because it was not reasonably foreseeable to them that he would take his share of the drugs to New York.

First, the conspiracy otherwise existed only in St. Croix and Florida, and Jackson testified at trial that none of the defendants knew he was going to New York to sell his share of the drugs. Tr. 1025 ("Q. So they had no control over where you were going or who you were dealing with; isn't that correct? A. With my portion, that is correct, sir. Q. They didn't know anything about you traveling 1500 miles to New York to sell some drugs; isn't that correct? A. No, sir."). The Government presented no evidence to show that they had any inkling that Jackson would travel all the way to New York to sell his share of the drugs.

To the contrary, the evidence suggested that defendants were annoyed at Jackson because he had disappeared without telling them where he was going.

Second, the Government suggested at trial that defendants knew or should have known that Jackson would go to the SDNY because (1) at the time of Jackson's arrest, a kilogram of cocaine sold for between $40,000 to $45,000 in New York, Tr. 212 (testimony of FBI agent), but only between $25,000 and $27,000 in Florida, Tr. 311, and (2) in 2011 Jackson had passed through New York to visit his daughter in New Jersey and he had previously sold cocaine in Queens, Tr. 945, 948 (testimony of Jackson). Both suggestions fail. The fact that cocaine commanded a higher price in New York than in Florida does not demonstrate that it was reasonably foreseeable to defendants that Jackson would travel to the SDNY to sell the drugs. Under this theory, the Government could argue that it is reasonably foreseeable in every conspiracy that drugs will be sold in New York because they will garner a higher price there.[2] Moreover, nothing in the record

---

[2]   *See United States v. Geibel*, 369 F.3d 682, 697 (2d Cir. 2004) (finding mere fact that defendant misappropriated securities information in New York insufficient to establish venue in the SDNY in part because "to hold otherwise would be to in effect grant the Southern District of New York carte blanche on venue in virtually all insider trading cases" (internal quotation marks omitted)).

suggests that defendants knew that Jackson had ever been in New York, that he had a daughter in New Jersey, or that he had previously sold drugs in New York. The Government's suggestion that defendants knew or should have known from these facts that Jackson was likely to go to New York is pure speculation. Even the majority is skeptical that Jackson's drive over the Narrows was reasonably foreseeable to defendants.

## II.  *Phone Calls*

In my view Jackson's phone calls from "New York" -- the only basis for venue relied on by the majority -- also do not suffice to establish venue in the SDNY.

First, it is doubtful that the phone calls were in furtherance of the conspiracy. *See Davis*, 689 F.3d at 189. Jackson was already under arrest when he made the calls. He was in custody and thus he was not actually in the process of selling his share of the cocaine.

Second, even assuming the phone calls were in furtherance of the conspiracy,[3] Jackson told Thomas and Tang Yuk only that he was in "New York"

---

[3]      "[A] telephone call placed by a government actor within a district to a conspirator outside the district can establish venue within the district provided the

- 5 -

and he did not mention Manhattan or any other location specific to the SDNY.[4]

Defendants, who were in St. Croix or Florida, did not know that Jackson's reference to "New York" meant that he was in Manhattan or some other county within the SDNY, and there is nothing in the record to suggest that they had or should have had any inkling that he would be heading to New York City much less the SDNY.[5] While the majority concludes that it was "fair" for the jury to find that the phrase "New York" commonly refers to "New York City" and that it was not "impermissibly speculative for the jury to infer that Thomas and Tang

---

conspirator uses the call to further the conspiracy." *Rommy*, 506 F.3d at 122. "[T]he critical factor in conspiracy venue analysis is not . . . whether the conspirator is communicating with someone who is a knowing confederate, [or] an undercover agent," but "whether the conspirator used the telephone call to further the objectives of the conspiracy." *Id.* "Accordingly, even with respect to telephone calls placed by non-conspirators to conspirators, . . . [c]alls 'to or from' a district can constitute overt acts sufficient to establish venue, provided that the conspirator uses the call to further the objectives of the conspiracy." *Id.* at 122-23 (emphasis omitted) (quoting *United States v. Kim*, 246 F.3d 186, 193 n.5 (2d Cir. 2001)).

[4] *Cf. Rommy*, 506 F.3d at 124 & n.11 (explaining that there was "no occasion to consider the fact that the city's boroughs span both [the SDNY and the EDNY] venues," but nevertheless concluding that defendant knew co-conspirator was in SDNY because he said on telephone call he was in "New York" looking at site of collapsed World Trade Center); *see also Lange*, 834 F.3d at 67 & n.5 (Government did not argue that 718 area code implied activity in EDNY, where "[t]he 718 area code covers areas within and outside the EDNY," and addresses for phone numbers were not given).

[5] The instant case, involving a St. Croix and Florida-based conspiracy, differs from those involving New York metropolitan-based drug operations. *Cf. Davis*, 689 F.3d at 189 (defendant reasonably could have foreseen effect on illicit commerce in SDNY by committing robbery in EDNY of drug dealer who trafficked in Bronx).

Yuk would interpret 'New York' to include the [SDNY]," Maj. Op. at 17 n.3, in my view this would be more of an assumption or guess than a finding of fact based on record evidence. On this record, the jury's apparent conclusion that individuals in St. Croix and Florida with no apparent connection to New York City would believe that Jackson's references to "New York" meant that he was in Manhattan or some other county within the SDNY was based not on evidence but speculation. *See United States v. Torres*, 604 F.3d 58, 67 (2d Cir. 2010) ("[T]he jury's inferences must be 'reasonably based on evidence presented at trial,' not on speculation." (citation omitted)); *A. Stucki Co. v. Worthington Indus., Inc.*, 849 F.2d 593, 597 (Fed. Cir. 1988) ("Common sense is not evidence."); *see also United States v. Wiley*, 846 F.2d 150, 155 (2d Cir. 1988) (overturning verdict where jury "must have engaged in false surmise and rank speculation"). In addition, although we review Parilla's venue objections on appeal only for plain error because he did not raise them in the district court, the jury's inference that the SDNY was reasonably foreseeable to Parilla was especially speculative. Jackson did not call Parilla to inform him that he was in New York, and there is no evidence in the record that either Thomas or Tang Yuk relayed Jackson's location to Parilla.

- 7 -

Third, and more fundamentally, even if a jury could infer that Jackson's passing references to "New York" made conduct in the SDNY reasonably foreseeable to defendants, the underlying telephone calls that formed the basis for the jury's inference were entirely contrived by the Government. Jackson made the telephone calls at the behest of the agents, who were using the phone calls at least in part to establish venue. He was arrested in the EDNY after delivering cocaine to his associate in Queens. Government agents brought him into the SDNY and, as he testified, instructed him to call defendants and to tell them that he was in New York, even if he was not asked. There is nothing in the record to suggest that Jackson would have gone into the SDNY -- let alone called the defendants and disclosed his location as "New York" -- on his own.

Our decisions have left open the possibility of finding that venue was not established where law enforcement engaged in conduct intended to create venue where it otherwise did not exist.[6] Our decision in *Ramirez-Amaya* is

---

[6] *See United States v. Rutigliano*, 790 F.3d 389, 398-99 (2d Cir. 2015) (rejecting "manufactured venue" argument in part because there was no basis to conclude the government "lured [defendants] to a faraway land" or "any unfair advantage was obtained," but noting "[w]e have . . . previously recognized the possibility that, under certain circumstances, venue manipulation might be improper"); *United States v. Myers*, 692 F.2d 823, 847 n.21 (2d Cir. 1982) ("We do not preclude the possibility of similar

instructive. There, we rejected an argument that venue in the SDNY was improper where undercover agents flew a plane carrying cocaine to LaGuardia Airport in the EDNY, where "the course of the flight carried the airplane over the Narrows," which we held was sufficient to make venue in the SDNY proper. 812 F.2d at 816. We noted, however, that: "[W]e would be loath to uphold venue on the basis of the flight path of an aircraft manned solely by government agents if there were an indication that its route had been significantly out of the ordinary, considering its point of departure and its destination." *Id.*; *see also United States v. Naranjo*, 14 F.3d 145, 147 (2d Cir. 1994) (finding no "artificially created venue" where the government "'did not orchestrate the phone call in order to lay the groundwork for venue' in the Southern District" (quoting *United States v. Lewis*, 676 F.2d 508, 511 n.3 (11th Cir. 1982))).

In the circumstances of this case, where the connection to the SDNY was so tenuous, I am troubled by the notion that these defendants could be convicted based on phone calls made by Jackson from the SDNY solely at the

---

concerns [of manufactured venue or jurisdiction] if a case should arise in which key events occur in one district, but the prosecution, preferring trial elsewhere, lures a defendant to a distant district for some minor event simply to establish venue.").

instruction of the agents. Jackson had no intention of going into the SDNY, but was taken there *by* the agents, *after* they arrested him in Queens. Absent those phone calls, as the majority appears to recognize, there was no reason for defendants to reasonably foresee that Jackson was in New York, much less the SDNY. In other words, absent those phone calls, there would be no basis for venue in the SDNY as to defendants. *Cf. Rommy*, 506 F.3d at 124 (rejecting venue challenge where disputed phone calls did not result from "chance use of a telephone," as defendant had deliberately chosen New York as the smuggling destination and knew people in New York who could further his scheme); *see United States v. Cordero*, 668 F.2d 32, 44 (1st Cir. 1981) ("It [wa]s not as if [the co-conspirator] were a traveler making chance use of a telephone as a bus stop," in part because defendant knew co-conspirator was calling from the district of venue).

* * *

Some of our cases have applied a "substantial contacts" test in considering venue.[7] *See, e.g., Lange*, 834 F.3d at 71; *Rutigliano*, 790 F.3d at 399;

<hr>

[7] Although the majority claims that the substantial contacts inquiry "has no relevance" when an overt act has been committed in the district of venue, Maj. Op. at 12

- 10 -

*Davis*, 689 F.3d at 186.  This test "takes into account a number of factors," such as "the site of the defendant's acts, the elements and nature of the crime, the locus of the effect of the criminal conduct, and the suitability of the [venue] for accurate factfinding."  *Lange*, 834 F.3d at 71 (alteration in original) (first quoting *Rutigliano*, 790 F.3d at 399; then quoting *Royer*, 549 F.3d at 895).  The substantial contacts inquiry is not a "formal constitutional test," but instead is a useful guide to consider "whether a chosen venue is unfair or prejudicial to a defendant."  *United States v. Saavedra*, 223 F.3d 85, 93 (2d Cir. 2000); *see also Rommy*, 506 F.3d at 119 ("The venue requirement serves to shield a federal defendant from 'the unfairness and hardship' of prosecution 'in a remote place.'" (quoting *United States v. Cores*, 356 U.S. 405, 407 (1958))).

The contacts with the SDNY here were by no means substantial.  The drive over the Verrazano-Narrows Bridge was an incidental contact with the SDNY, as Jackson was driving from one part of the EDNY (Staten Island) to get to another part of the EDNY (Brooklyn) to get to his destination in yet another

n.2, our cases have not uniformly imposed such a limitation.  *See, e.g., Davis*, 689 F.3d at 186 (requiring both reasonable foreseeability and substantial contacts); *United States v. Royer*, 549 F.3d 886, 895 (2d Cir. 2008) (requiring substantial contacts in addition to "some activity in the situs district").

part of the EDNY (Queens). This brief contact with the SDNY was largely the result of a legal fiction deeming the Narrows within the jurisdiction of both districts. Moreover, there is nothing in the record to suggest that Tang Yuk, Thomas, or Parrilla had any hint that Jackson was headed to New York at all, much less to the SDNY. Similarly, Jackson's phone calls from "New York" were made at the behest of the agents, after they arrested him in Queens, and after they brought him into the SDNY with instructions to call defendants and say he was in "New York." These calls were akin to "the product of some 'chance use of a telephone' by a government agent" referred to in *Rommy*, 506 F.3d at 124. In my view, the Government failed to prove that it was reasonably foreseeable to the defendants that Jackson would take the Florida and St. Croix-based conspiracy to the SDNY, when Jackson gave no hint that he would be driving his share of the drugs some 1,500 miles north to New York.

If the majority is correct, once the Government arrested Jackson in Queens, they could have flown him, for example, to South Dakota and instructed him to make the same phone calls, saying "I'm in South Dakota" instead of "I'm in New York." On the Government's theory, defendants would have been subject

to venue in South Dakota. That cannot be the law. "To comport with constitutional safeguards, . . . there must be some 'sense of [venue] having been freely chosen' by the defendant." *Davis*, 689 F.3d at 186 (alteration in original) (quoting *United States v. Reed*, 773 F.2d 477, 481 (2d Cir. 1985)). That requirement was not met here.

I would vacate the convictions for improper venue. Accordingly, I dissent.